IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br>vs.<br><br>ARTHUR JENKINS<br><br>Defendant. | No.1:17-CR-00154-6-MAC |

**REPORT AND RECOMMENDATION DENYING DEFENDANT'S
MOTIONS TO SUPPRESS**

Pending before the Court is Defendant Arthur Jenkins' ("Jenkins") "Motion to Suppress the Confession and/or Statements" (Doc. No. 216) and "Motion for Suppression of Evidence" (Doc. No. 217). On June 29, 2018, United States District Judge Marcia A. Crone referred these motions to the undersigned United States magistrate judge for consideration and entry of proposed findings and a recommended disposition. (Doc. No. 249, citing 28 U.S.C. § 636(b)(1)(B)); E. D. TEX. CRIM. R. 59(d). On July 25, 2018, the undersigned held a hearing on these motions. Because the searches and seizures at issue were lawful, both motions to suppress should be denied.

**I. RELEVANT FACTS**

At the hearing on the instant motions, Corey Pinckney, a task force officer with the Beaumont Police Department and Drug Enforcement Administration, testified regarding the investigation of alleged criminal activity involving Jenkins and the co-defendants. TFO Pinckney stated that a Title III, court authorized wiretap intercepted phone calls between Jenkins and co-defendant Eric Coleman on August 18, 2017. On that phone call, Jenkins asked about "a

1

lick" in which Jenkins was to put someone on his "a\*\*" for Coleman. Jenkins told Coleman that he and an unidentified individual were "strapped" and ready to go. TFO Pinckney interpreted that to mean Jenkins was armed and ready to commit violent acts against an individual on Coleman's behalf. Jenkins can also be heard discussing the purchase of two grams of cocaine from Coleman for Jenkins' co-worker. (*See* Ex. 1A.) Later that day, Jenkins and Coleman spoke again about the cocaine purchase, and Coleman told Jenkins to meet him at "the field" on Lawrence Drive at 5:45 p.m. (*See* Ex. 1B.) TFO Pinckney described "the field" as a location on Lawrence Drive where Coleman and others often sold narcotics.

In response to these wire interceptions, TFO Pinckney advised BPD Officers Clint Weir and Jesse Warner of the planned drug transaction so they could perform surveillance. BPD Lt. Mills was also working surveillance that day and was informed by the "wire room" about the transaction at "the field." Lt. Mills drove by the residence and saw three cars. He identified the black Cadillac as Coleman's vehicle. (Ex. 2.)

Officer Weir testified that he was given a description of Jenkins' vehicle and stationed his patrol unit about two miles away on Helbig and Plant Road. Officers Weir and Warner then followed Jenkins' white Buick LaSabre. Officer Weir testified that his patrol car GPS showed the Buick traveling at 56 mph in a 40 mph speed zone. He also stated that he paced him going at this same speed. Therefore, Officer Weir pulled the Buick over for speeding and on suspicion of possession of drugs based upon the wiretaps. Jenkins' co-worker, Derrick Watts, was driving the Buick with an open container of beer, and he did not have a valid driver's license. When Officer Weir advised Watts that he stopped him for speeding, Watts did not dispute that he was speeding. (Ex. 3B.) Watts also advised Officer Weir that he had an outstanding warrant for his arrest from Lumberton, Texas.

Officer Warner was the last witness called by the Government. His body camera showed footage of Jenkins during the traffic stop. (*See* Ex. 3C.) Officer Warner approached the passenger side of Watts' vehicle and observed Jenkins grab a green cigarette pack, stuff something inside of it, then put it back in the console. (*Id.*) He also saw him try to put something inside of his boot, so he asked Jenkins to exit the vehicle and remove his boot. (*Id.*) Jenkins admitted that he had synthetic marijuana and was trying to hide it. (*Id.*) He then took the substance from his boot and turned it over. (*Id.*) He also notified Officer Warner that he had an outstanding warrant for a traffic ticket. (*Id.*)

Based upon all of the above information, the officers handcuffed Watts and Jenkins, and Officer Weir began to search the vehicle. His search revealed a packet of cocaine tucked into a green Kool cigarette pack. (Ex. 3B.) Following the search, Officer Warner attempted to read Jenkins the *Miranda* warning, but Jenkins interrupted him and said that he knew his rights and it did not need to be read to him.[1] (Ex. 3C.) Jenkins then admitted that the cocaine came from "Pop" and allowed Officer Warner to look for the name in his cell phone. (*Id.*) Officer Warner saw a contact saved as "Lil Eric", who he believed to be Eric Coleman. (*Id.*) Jenkins was shortly released after this incident.

At the hearing, Officer Pinckney also discussed a later wire interception on November 28, 2017, which recorded Coleman and Jenkins discussing a job for Jenkins to kill someone for $2,000. (Ex. 4A.) Coleman said he would get a car for Jenkins to do the job in a couple weeks and explained to Jenkins that he should shoot through the door at the victim instead of through the window. (*Id.*) Two days later, Coleman and other co-defendants were arrested. Jenkins was arrested on January 11, 2018, for the charges alleged in the indictment.

---

[1] A short conversation with between Officer Warner and Jenkins occurred after he was handcuffed but before he was read the *Miranda* warning. The Government stipulates it will not be offering these statements.

3

After his arrest, Jenkins was interviewed by DEA officers and Assistant United States Attorney Christopher Rapp. (Ex. 4B.) To begin the interview, an officer read Jenkins his *Miranda* rights, but Jenkins interrupted the officer several times. (*Id.*) Jenkins stated that he had a lawyer on retainer and asked why he was there without a lawyer. (*Id.*) However, he never requested a lawyer to be present with him, and he acknowledged that he understood his rights and continued to communicate with the officer about his involvement with Coleman. (*Id.*) Officer Pinckney testified that Jenkins never requested an attorney to be present with him during the interview, and no promises or threats were made to Jenkins. (*Id.*) Jenkins admitted in the video that he obtained two grams of cocaine from Coleman for his co-worker, but he claims that he never intended on following through with the violent acts discussed on the wiretaps with Coleman. (*Id.*)

## II. RELEVANT LAW AND DISCUSSION

In the two motions to suppress, Jenkins claims: (1) the initial stop of the vehicle in which he was a passenger was not based upon reasonable suspicion; (2) the search of the vehicle and its contents were not based upon probable cause; (3) the search of his cell phone was unlawful; and (4) two different statements taken from Jenkins were unlawful.

### A. Detention of the Vehicle

The Fourth Amendment prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and effects." U.S. CONST. IV. Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Because traffic stops are considered more similar to investigative detentions than formal arrests, the legality of traffic stops for Fourth Amendment

4

purposes is analyzed under the standard articulated in *Terry v. Ohio,* 392 U.S. 1 (1968). *Terry* requires that courts apply a two-step "reasonable suspicion" inquiry to:

> 1) determine whether the officer's action was justified at its inception; and
> 2) determine whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.

*United States v. Zamora*, 661 F.3d 200, 204 (5th Cir. 2011). The government bears the burden of establishing the two elements under *Terry* by a preponderance of the evidence. *United States v. McMahan*, No. 3:07-CR-152, 2007 WL 2470999, at *4 (N. D. Tex. Aug. 30, 2007) (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003)).

In *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005), the Fifth Circuit succinctly explained the first prong of *Terry*:

> For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *See United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995). The Supreme Court has stated that in making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273. We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *See, e.g., United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvizu*, 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry*, 392 U.S. at 27. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. *Arvizu*, 534 U.S. at 274.

The Fifth Circuit has held that even a minor traffic violation can justify a traffic stop. *See, e.g. Zamora*, 661 F.3d at 204 (holding that a missing front license plate and cancelled rear license plate provides police with reasonable suspicion)*; United States v. Summers*, 108 F. App'x 192, 193 (5th Cir. 2004) (holding that the district court did not err in holding a traffic stop was

5

justified by believing the testimony of the arresting officer who stopped the vehicle because of the driver's failure to signal before turning).

In this case, Jenkins argues that there was no reasonable suspicion to stop Watts' vehicle, because pacing and GPS are not reliable in judging the speed of a vehicle, and there was no personal knowledge of the actual drug exchange. The Government maintains that the stop was justified based upon the speeding violation, as well as the wiretap communications and surveillance of the vehicles prior to the stop.

The Fifth Circuit has approved pacing as an acceptable method for establishing reasonable suspicion. *United States v. Archuleta*, 463 F. App'x 412, 417 (5th Cir. 2012); *United States v. Castro*, 166 F.3d 728, 733-34 (5th Cir. 1999). In addition, the GPS device used by Officer Weir provided further support for his objective reasonable suspicion that Watts was committing a traffic violation. Notably, even if these methods are not completely foolproof as alleged by Jenkins, courts have held that as long as the officer had an objectively reasonable basis for initiating the stop, any factual mistake as to whether the defendant was speeding does not diminish the officer's legal basis to make the stop. *See Archuleta,* 463 F. App'x at 417-418. Moreover, as long as there is an objective basis for the stop, an officer may stop a vehicle for a traffic violation even if his actual motive is to investigate an unrelated criminal offense. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Lujan,* 578 F. App'x 410, 412 (5th Cir. 2014).

Secondly, even if Officer Weir did not have reasonable suspicion that Watts' vehicle was speeding, he still had reasonable suspicion that the occupants of the vehicle were in possession of controlled substances. TFO Pickney testified that he alerted Officer Weir about the possible drug transaction he heard over the wiretap, and Officer Weir was given a description of the

6

vehicle that was purportedly involved. To establish reasonable suspicion for a traffic stop, an officer does not need to personally observe or have personal knowledge of a criminal violation. Reasonable suspicion can be developed from the "collective knowledge" of various law enforcement officers or agencies. *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759-60 (5th Cir. 1999). Thus, Officers Weir and Warner, even if they had no personal knowledge of the evidence held by TFO Pinckney and other DEA officers investigating Coleman and Jenkins, could rely on such evidence in forming reasonable suspicion for the traffic stop. *See United States v. Khanalizadeh,* 493 F.3d 479, 483 (5th Cir. 2007) (holding that an officer had reasonable suspicion when relying on FBI's wiretaps and previous surveillance indicating defendant was involved in drug trafficking even though he did not have personal knowledge of the evidence uncovered by the FBI.) Accordingly, there was ample reasonable suspicion that criminal activity was occurring in order to justify the initial detention of Watts' vehicle.

Under the second prong of *Terry*, the question before the court is whether the officers' actions after they legitimately stopped the Buick were reasonably related to the circumstances that justified the stop, or to dispelling the reasonable suspicion developed during the stop. *United States v. Machuca–Barrera*, 261 F.3d 425, 434 (5th Cir. 2001). Here, additional reasonable suspicion developed quickly after the stop when Officer Warner observed Jenkins secreting something in the cigarette pack and his boot, coupled with his admission that he had synthetic marijuana. Further, detention was also completely justified because both Watts and Jenkins admitted that there were outstanding warrants for their arrest. Lastly, because Officer Weir had information from TFO Pinckney about Jenkins' suspected narcotics trafficking with Coleman, it was another factor that contributed to reasonable suspicion in order to prolong the detention. *See United States v. Berry,* 664 F. App'x 413, 419 (5th Cir. 2016), *as revised* (Dec.

7

14, 2016), *cert. denied*, 137 S. Ct. 1391 (2017). Based upon these circumstances, there was reasonable suspicion to continue Jenkins' detention after the initial stop.

### B. Search of the Vehicle

#### 1. Standing to Contest Search of Vehicle

Generally, a passenger without a possessory interest in the vehicle lacks standing to complain of its search, because his privacy expectation is not infringed. *United States v. Roberson, Jr.*, 6 F.3d 1088, 1091 (5th Cir.1993); *United States v. Mendoza–Burciaga*, 981 F.2d 192 (5th Cir.1992) (only the driver has standing to challenge the search; the passenger in the truck has no standing to challenge the search); *United States v. Cardona*, 955 F.2d 976, 981 (5th Cir. 1992) (the non-owner/passenger of a car had no standing to challenge search of the vehicle which was registered to a third party); *United States v. Harrison*, 918 F.2d 469, 472 (5th Cir. 1990) (the passenger did not have standing to contest search of the truck).

Because Jenkins was a passenger in Watts' vehicle and has otherwise not shown a possessory or ownership interest in the vehicle, he has no standing to challenge the search of the vehicle or its contents. In any event, there was probable cause to search Watts' vehicle and its contents as discussed below.

#### 2. Probable Cause to Search Vehicle

The automobile exception to the rule against warrantless searches allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999). "Probable cause exists if, under the totality of the circumstances, there is fair probability that contraband or evidence of a crime will be found at a specified location. It is a flexible, non-demanding standard." *United States v. Whisman*, No. 4:16-CR-00173, 2018 WL 459342, at *7 (E.D. Tex. Jan. 5, 2018), *report and recommendation*

*adopted*, 2018 WL 454248 (E.D. Tex. Jan. 17, 2018) (citing *State v. Cuong Phu Le*, 463 S.W.3d 872, 878 (Tex. Crim. App. 2015)); *see also United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006). The scope of a search of a vehicle includes the search of closed containers provided that probable cause exists to believe that contraband or evidence may be hidden in the compartments and containers searched. *See United States v. Ross*, 456 U.S. 798, 572 (1982).

In the instant case, there was probable cause to search Watts' vehicle and the Kool cigarette pack based upon the totality of the circumstances. Probable cause to search existed not only because of Jenkins' voluntary, non-custodial *res gestae* statement that he possessed synthetic marijuana, but also the wiretap communications and surveillance indicating that they had just purchased two grams of cocaine from Coleman, as well as Jenkins' furtive movement indicating that he stuffed something into the cigarette pack as Officer Warner approached the passenger side of the vehicle.

### C. Search of the Cell Phone

A search warrant or Jenkins' consent was needed to search Jenkins' cell phone. *United States v. Escamilla*, 852 F.3d 474, 485 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 336 (2017) (citing *Riley v. California*, ––– U.S. –––, 134 S. Ct. 2473, 2495 (2014). Here, Jenkins consented to the search of his cell phone. After being read his *Miranda* warning, Jenkins told Officer Warner that he took Watts to meet someone named "Pop" to buy cocaine. (Ex. 3C.) Officer Weir then asked Jenkins' if he knew Pop's phone number and if he had it saved in his phone. (*Id.*) Jenkins told him that it should be in his cell phone. (*Id.*) Officer Warner then retrieved the phone from the police vehicle, and Jenkins told him to swipe up on it to access the contents of the phone. (*Id.*) Officer Warner asked Jenkins if he had a problem with him looking through his phone, and Jenkins stated, "no you can look." (*Id.*); *see Escamilla, supra*, (finding voluntary consent when

9

officer asked defendant "do you mind if I look through your phone" and defendant handed it over.) Consequently, because Jenkins voluntarily consented to the search of his cell phone, it was lawful.

### D. Post-Arrest Custodial Interview

In *Miranda v. Arizona*, the United States Supreme Court found "that the statements given by a defendant during a custodial interrogation are inadmissible at trial unless, prior to questioning, the suspect '[is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *DeCossas v. St. Tammany Parish School Board*, No. 16–3786, 2017 WL 3971248, at *11 (E.D. La., Sept. 8, 2017) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). A suspect may, however, waive his *Miranda* rights, provided his waiver is made voluntarily, knowingly and intelligently. *Miranda*, 384 U.S. at 444.

With regard to the right to counsel when under interrogation, officers must cease questioning if a suspect makes a clear, unambiguous, and unequivocal request for an attorney. *See Davis v. United States*, 512 U.S. 452, 459 (1994) ("maybe I should talk to a lawyer" did not invoke the right to an attorney). However, if the request does not meet these requirements or the accused himself initiates further communication with the officer, there is no requirement that the questioning cease, nor is there an obligation for the officer to clarify an ambiguous comment of the accused. *Id.*; *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010).

In the instant case, Jenkins argues that the *Miranda* warning was insufficient because Jenkins interrupted the officer several times while reading the warning. Further, he believes his comments regarding retained counsel should have halted the questioning until his attorney

arrived. Jenkins also alleges that AUSA Rapp's admonishments regarding the potential penalties he would be facing constituted undue influence or threats.

The Government notes that the officer repeated himself regarding the warnings to ensure that Jenkins heard them, and he also asked Jenkins several times if he understood. In addition, the Government cites to the requirement that a request for an attorney during custodial interrogation must be clear and unequivocal and that Jenkins failed to make a clear and unequivocal request in this instance. Instead, Jenkins told the officer to sit down and talk with him. Further, the Government asserts that the admonishment regarding the penalties was just that—a statement of fact, albeit an uncomfortable one.

The undersigned agrees with the Government. Officers arrested Jenkins on January 11, 2018 and took him into custody. (Ex. 4B.) An officer read the *Miranda* warning to Jenkins. (*Id.*) Jenkins interrupted the officer and stated that he had a lawyer on retainer and also asked why he was there without a lawyer. (*Id.*) The officer continued to read the warnings and asked Jenkins multiple times if he understood the warning. (*Id.*) Jenkins acknowledged that he understood and told the officer, "sit down, let's talk," and "yes, let's go. Get this over with man." (*Id.*) Jenkins never made a direct, clear, unequivocal request for a lawyer to be present with him during questioning. (*Id.*) Moreover, no promises, threats or misrepresentations were made to Jenkins. Therefore, Jenkins' statements should be admitted at trial.

### III. <u>RECOMMENDATION</u>

The August 18, 2017 detention and search of the vehicle was lawful pursuant to *Terry* and the vehicle exception to the probable cause requirement. Consequently, the evidence obtained as a result of that search should be admissible, except for the statements made by Jenkins from the time he was placed in handcuffs until the *Miranda* warning was read, as

stipulated to by the Government. Further, the post-arrest interview on January 11, 2018, was conducted lawfully with the appropriate *Miranda* warnings, and Jenkins' statements were made voluntarily, free from undue coercion, promises, or false representations. Consequently, the district court should **DENY** both of the Defendant's Motions to Suppress (Doc. Nos. 216, 217).

## IV. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this report and recommendation. Objections to this report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this report, and (4) no more than eight (8) pages in length. *See* 28 U.S.C. § 636(b)(1)(c); FED R. CIV. P. 72(b)(2); Local Rule CV-72(c). A party who objects to this report is entitled to a *de novo* determination by the United States District Judge of those proposed findings and recommendations to which a specific objection is timely made. *See* 28 U.S.C. § 636(b)(1)(c); FED R. CIV. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within seven (7) days of being served with a copy of this report, bars that party from: (1) entitlement to de novo review by the United States District Judge of the findings of fact and conclusions of law, (*see Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988)), and (2) appellate review, except on grounds of plain error, of any such

findings of fact and conclusions of law accepted by the United States District Judge. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

    SIGNED this 8th day of August, 2018.

                                                                         Zack Hawthorn
                                                                         United States Magistrate Judge